**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| **SYNGENTA CROP PROTECTION AG** | |
| **Plaintiff,** | |
| **v.** | **JURY TRIAL DEMANDED** |
| **UPL Limited**<br>**UPL Corporation Limited**<br>**UPL NA Inc.** | **Civil Action No.:** 3:25-cv-735-RCY |
| **Defendants.** | |

## COMPLAINT

1. Plaintiff Syngenta Crop Protection AG ("Syngenta"), hereby alleges for its Complaint against UPL Limited ("UPL Ltd."), UPL Corporation Limited ("UPL Corp."), and UPL NA Inc. ("UPL NA") (UPL Ltd., UPL Corp., and UPL NA together "UPL"), as follows:

## PARTIES

2. Syngenta is a corporation organized and existing under the laws of Switzerland having its principal place of business located at Rosentalstrasse 67, 4058 Basel, Switzerland. Syngenta specializes in the development and production of crop protection products, including fungicides, pesticides, and herbicides. Syngenta operates globally and focuses on developing and delivering crop protection and farming practice products for empowering farmers to profitably meet the crop and food demands of a growing population while preserving the natural resources.

3. UPL Ltd. is a corporation organized and existing under the laws of India having its principal place of business at Uniphos House, C.D. Marg, 11th Road, Madhu Park, Khar (West), in Mumbai, India. UPL produces ingredients for crop protection products and also sells

these products across more than 140 countries. Among the largest crop protection companies worldwide, UPL offers fungicides, herbicides, and other agricultural related products. Its fungicide segment is particularly focused on crop diseases through formulations that include Mancozeb. Mancozeb is one of the most widely used fungicides globally for protecting fruits and vegetables, followed by cereals and grains.

4. UPL Corp. is a corporation organized and existing under the laws of the Republic of Mauritius having its principal place of business at 1 Medici Courtyard, London W1S 1BR in the United Kingdom, and a place of business at 15401 Weston Parkway, Suite 150, Cary, NC 27513. UPL Corp's primary activity is the production and marketing of crop protection products worldwide for the UPL companies.

5. UPL NA is a corporation organized and existing under the laws of the State of Delaware having its principal place of business at 630 Freedom Business Center Drive, Suite 402, King of Prussia, Pennsylvania 19406. UPL NA is the North American branch of UPL Ltd., and UPL NA is involved in the distribution and sales of crop protection products for the UPL companies.

6. At all times relevant, UPL Ltd. has possessed and been responsible for research and development, patents, supply contracts, product formulations, and corporate investments on behalf of itself and its subsidiary companies. Also at all times relevant, UPL Ltd. has wholly owned UPL Corp. and UPL NA, directors and executive managers of UPL Ltd. occupy similar positions of UPL Corp. and UPL NA and, on information and belief, UPL Ltd. has directed and managed the operation of its subsidiary companies, including UPL Corp. and UPL NA. UPL Ltd. reports consolidated financial results for itself and its subsidiaries, including UPL Corp. and UPL NA, due to UPL Ltd.'s ability to control the results of its subsidiaries.

## NATURE OF THE ACTION

7. This is an action for a declaratory judgment arising under the patent laws of the United States, Title 35 of the United States Code, and the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq.* with respect to U.S. Patent No. 11,445,727 ("'727 patent," attached as Exhibit A) and U.S. Patent No. 12,402,625 ("'625 patent," attached as Exhibit B). The '727 patent is entitled "Fungicidal Combinations" and issued on September 20, 2022. The '625 patent is entitled "Fungicidal Combinations" and is a continuation of the application underlying the '727 patent and issued on September 2, 2025. UPL Ltd. is the assignee of the '727 patent and the '625 patent.

8. Syngenta seeks a declaration that the '727 patent is unenforceable due to inequitable conduct. Syngenta further seeks a declaration that the '625 patent is invalid under 35 U.S.C. §§ 102, 103, and/or 112 and is unenforceable due to inequitable conduct.

9. This also is an action for declaratory relief and damages under the Sherman and Declaratory Judgment Acts, 15 U.S.C. § 2 and 28 U.S.C. § 2201, arising from UPL's unlawful efforts to monopolize crop protection markets, specifically: (a) UPL's misuse of the unlawfully obtained '727 and '625 patents to monopolize U.S. fungicidal combination products consisting of mancozeb, benzovindiflupr (an active ingredient within a Syngenta patent), and at least one other active ingredient; and (b) UPL's parallel anticompetitive efforts to try to monopolize multisite fungicides in the United States, Brazil, and/or worldwide.

10. This action also seeks damages, injunctive, and other relief for UPL's anticompetitive, exclusionary, deceptive, and unfair conduct in violation of federal antitrust law.

## BACKGROUND

11. Crop protection products are used worldwide by agricultural farmers to prevent

disease and stress and protect plant health, manage weeds, and control pests. These products enable farmers preserve crop yield and improve the overall quality of their crops, helping farmers operate profitably and sustainably, while building food security for consumers.

12. Crop protection companies like Syngenta and UPL make and sell crop protection products such as fungicides. Crop protection products ultimately are sold to end users like agricultural farmers for use to protect crops.

13. It is common in the agricultural industry for crop protection companies to procure from other manufacturers active ingredients that would not be economical or practicable for those companies to manufacture themselves. It also is common in the industry for crop protection companies to combine or synthesize those ingredients for producing their formulated crop protection products for distribution and sale.

14. Mancozeb, an active ingredient, is a multisite fungicide first registered in the United States in 1948. It is utilized on its own or in combination with other fungicides to manage fungicidal resistance.

15. Benzovindiflupyr is a succinate dehydrogenase inhibitor (SDHI) fungicide that was developed by Syngenta and first made available in 2015 as a product called Solatenol®. Syngenta owns patent rights that cover the active ingredient in benzovindiflupyr, its synthesis methods, mixtures, formulations, and uses. Syngenta also markets and sells fungicidal combinations that include benzovindiflupyr such as Elatus®, which contains benzovindiflupyr and azoxystrobin, and Mitrion™, which contains benzovindiflupyr and prothioconazole.

16. Syngenta and UPL entered into a procurement agreement on August 17, 2017, for the supply of mancozeb. UPL was to supply mancozeb to Syngenta for "all formulated end-use products containing mancozeb technical alone or with one or more other active ingredients,

which Syngenta has Registered or will Register in the Territory." The August 17, 2017, Agreement defined "Territory" to include nearly 100 countries and, specifically, each of the United States and Brazil.

17. Problems occurred with UPL's supply of mancozeb. Issues included that UPL was unable to produce mancozeb at commercially reasonable prices. By 2019, Syngenta also began to source mancozeb from Corteva and Indofil, consistent with purchasers in the industry preferring multiple suppliers.

18. In 2021, UPL sued Adama Brasil S/A ("Adama") a related entity of Syngenta, in Brazil for patent infringement of a Brazilian patent ("Oliviera patent"), related to the subsequently issued '727 patent, having claims for treating soybean rust with mancozeb in combination with a first systemic fungicide and a second systemic fungicide, wherein the first systemic fungicide is picoxystrobin and the second systemic fungicide is tebuconazole. Thereafter Syngenta became concerned as to whether UPL had patent claims or pending patent claims that might cover a Syngenta product or planned product involving Syngenta's proprietary fungicides, specifically benzovindiflupyr.

19. On June 21, 2022, UPL's '727 patent was allowed by the United States Patent and Trademark Office ("USPTO"). UPL had first filed the underlying patent application for the '727 patent in 2016, shortly after Syngenta's September 2015 EPA registration and release of Solatenol® (benzovindiflupyr). The '727 patent application described purported field trials and resulting data involving the application of mancozeb in combination with Syngenta's Solatenol® (benzovindiflupyr) and other fungicides. As addressed in more detail below, on information belief, these field trials never took place, and the resulting data was fabricated. UPL relied on this fabricated data to obtain allowance of the '727 patent.

20. The allowed ’727 claims cover a fungicidal mixture containing mancozeb, benzovindiflupyr, and at least one other fungicide selected from a group of specified ergosterol biosynthesis inhibitors and quinone outside inhibitors. One of the ergosterol biosynthesis inhibitor fungicides specified in the claims is prothioconazole. One of the quinone outside inhibitor fungicides specified in the claims is azoxystrobin. Thus, the ’727 patent would cover a fungicidal combination that included mancozeb and Syngenta’s Solatenol® product, as well as a fungicidal combination that included mancozeb and Syngenta’s Mitrion™ product.

21. Two months before the issuance of the ’727 patent, at a July 20, 2022, meeting between UPL and Syngenta representatives, Syngenta sought assurance that it could sell its benzovindiflupyr in combination with mancozeb and other fungicides. In response UPL asserted its soon-to-issue ’727 patent, proposing to Syngenta a license for the upcoming ’727 patent in exchange for Syngenta’s agreement to source mancozeb from UPL. During that discussion, Kim Watson of UPL asserted the UPL patent position was strong. As support, Mr. Watson referred to the ongoing patent infringement between UPL and Adama in Brazil and that, to date, Adama had not been able to invalidate the related Oliviera family patent, which is a predecessor to the ’727 family of patents and also claims fungicidal combinations using mancozeb.

22. UPL and Syngenta met again a couple months later, but discussions between the parties broke down after UPL began making unreasonable demands in exchange for a ’727 patent license.

23. On January 31, 2023, Syngenta filed a Petition for a Post-Grant Review (“PGR”) to have all claims of the ’727 patent found unpatentable.

24. In February of 2023, UPL contacted Syngenta reiterating that Syngenta had three-way fungicidal mixtures for which Syngenta needed to be sourcing mancozeb from UPL.

25. On February 17, 2023, the parties had a telephonic meeting during which the parties discussed Syngenta's desire to enter the U.S. market and UPL's position that Syngenta needed a license to the '727 patent in order to have the "freedom to operate." UPL agreed to "prepare a proposal and forward ahead of the next meeting."

26. On March 2, 2023, UPL forwarded its proposal, offering Syngenta a royalty-free license under the '727 patent in exchange for Syngenta "sourcing 100% of its mancozeb requirements" from UPL, withdrawing the PGR, and agreeing not to challenge the '727 patent in the future. UPL further proposed that the license "would be royalty bearing if Syngenta chooses not to source its mancozeb from [sic] requirements from UPL."

27. On March 10, 2023, UPL again contacted Syngenta, stating that in exchange for a royalty-free license, "UPL would insist on supplying 100% of Syngenta's mancozeb requirements that are covered by the patent."

28. The parties then had a working group call on March 14, 2023, which was followed by a "revised draft proposal" from UPL on March 15, 2023. UPL's draft proposal stated that a license to the '727 patent would be "conditional upon Syngenta sourcing 70% of their mancozeb requirements from [UPL] for use in pre-mixes (or co-packs) covered by the patent."

29. On March 31, 2023, Syngenta proposed, *inter alia*, that the conditional 70% sourcing would be limited to sourcing of mancozeb for "Syngenta CP products containing Solatenol® + Mancozeb + Prothioconazole covered by valid granted claim of UPL patent as of the grant of this patent." Solatenol® is Syngenta's brand name for benzovindiflupyr.

30. On May 3, 2023, Kim Watson of UPL responded to Syngenta's March 31, 2023 proposal by limiting the proposed license grant to "the 3 way mixtures containing

(Benzovindiflupyr + prothioconazole + mancozeb) listed in the patent." In addition, UPL required that "Syngenta will purchase a minimum of 70% of their annual requirements of mancozeb (for the referenced mixture) from UPL" and that UPL would have "audit rights" to ensure compliance with the 70% sourcing requirement. The proposal was not limited to the sourcing of mancozeb in the United States, and throughout the parties' discussions UPL made clear that the sourcing requirement for mancozeb would apply globally.

31. In the end, Syngenta determined in 2023 that it could not source mancozeb from exclusively or nearly exclusively from UPL, as Syngenta's past experience demonstrated that UPL was unable to supply mancozeb at a fair market price to make UPL's proposals commercially reasonable and feasible. Syngenta also determined that UPL's proposed royalty terms for the '727 patent were commercially unreasonable and infeasible based on Syngenta's understanding that the patent is unenforceable and invalid.

32. During the PGR, UPL identified Syngenta's Mitrion™ product and repeatedly asserted that the product practiced the '727 claimed invention. In fact, during the PGR proceeding, UPL accused Syngenta of "copying" the claimed invention of the '727 patent through its development of its Mitrion™ product.

33. Given UPL's transparent effort to target Syngenta's proprietary benzovindiflupyr product in its filing and prosecution of the '727 patent, and its repeated stated position that its '727 patent was "strong" and Syngenta's sales in the United States of three-way fungicidal combinations containing mancozeb and benzovindiflupyr would infringe the '727 patent absent the unreasonable license terms demanded by UPL, Syngenta has been unable to move forward in the United States with plans to sell such fungicidal combinations or provide labels and/or sell-sheets to its customers regarding such fungicidal combinations.

34. During all times relevant, however, Syngenta has had the ability to have successfully launched crop protection products in the United States at least. In addition to its worldwide reputation as an innovative and reliable supplier of crop protection products, Syngenta has had the capital for investing in the development and commercialization of the products; it has industry expertise, infrastructure, and relationships for producing the products; it has demonstrated ability to gain government and regulator permissions and approvals to sell such products; it has an existing sales force and distribution network for selling the products; and it has a broad and loyal base of potential customers for the products. Indeed, Syngenta has sold such products and/or provided instructions for their use in Brazil and the UK.

35. After the negotiations between the parties were unsuccessful due to UPL's unreasonable demands and assertion of evidently invalid patents, and while Syngenta's PGR proceeding against the '727 patent was pending, UPL pursued a continuation application of the '727 patent, amending the claims to expressly and narrowly cover one of the specific fungicidal combinations that Syngenta had identified in the UPL negotiations and that Syngenta intended to sell in the U.S. market—i.e. mancozeb + benzovindiflupyr + prothioconazole. UPL's amended claim falls squarely within the scope of the broader '727 patent claim. On September 2, 2025, UPL's continuation patent, the '625 patent, issued containing the claim targeted at Syngenta's product.

36. The two largest producers of soybean in the world are Brazil (40%) and the United States (28%). Soybean crops face severe threat from Asian Soybean Rust ("ASR"), caused by *Phakopsora pachyrhizi*, a fungus causing substantial yield losses. In Brazil, Syngenta markets Mitrion™, which contains two active ingredients: Solatenol® (benzovindiflupyr) and prothioconazole. Syngenta's label in Brazil for Mitrion™ recommends combining the product

with mancozeb.

37. In the United States, Syngenta has registered Solatenol® (benzovindiflupyr) with the Environmental Protection Agency ("EPA") and sells Elatus®. Elatus® contains Solatenol® (benzovindiflupyr) and azoxystrobin (a fungicide named in claim 1 of the '727 patent as part of a claimed fungicidal combination with benzovindiflupyr and mancozeb). Syngenta has multiple existing contractual relationships with distributors and other customers in the United States for the sale of Elatus®, including relationships with Nutrien Ag Solutions.

38. To date, Syngenta has not marketed or sold the Mitrion™ product in the United States. Nor has Syngenta issued a label in the United States for Elatus® that recommends applying Elatus® in combination with a multisite fungicide, namely mancozeb. Syngenta also has not sold in the U.S. a co-pack of Elatus® and mancozeb or of Mitrion™ and mancozeb While Syngenta desires to market and sell one or more of these fungicidal products in the United States, including through its existing contractual relationships with distributors and other customers, and it has the experience and infrastructure to do so successfully and profitably as noted above, it has been unable to expand these relationships and make these sales in light of UPL's position that such combinations would infringe the '727 and '625 patents. To do so would put Syngenta at risk of UPL following through on its threats and suing Syngenta for patent infringement. The suits threatened by UPL would be costly for Syngenta to defend, would significantly disrupt Syngenta's business operations, could tarnish Syngenta's reputation in the industry and with customers, and would come with the risk of liability for damages for infringement. Based on these and related considerations, Syngenta made a reasonable and prudent decision not to sell the products, even though it has had the capability to do so successfully in a competitive market.

39. UPL has asserted the ’727 patent—a patent that targeted Syngenta’s Solatenol® (benzovindiflupyr) product using fabricated field trial data—against Syngenta, stating Syngenta must bind itself to sourcing 70% to 100% of its mancozeb supply from UPL or pay UPL an unreasonable royalty on the ’727 patent. UPL has reinforced the threat by also referring to its ongoing suit against Adama, a related entity of Syngenta, in Brazil over a fungicidal mixture involving mancozeb. During the PGR proceeding for the ’727 patent, UPL then pursued a continuation application of the ’727 patent in which it amended the claims to narrowly and expressly to read on one of the Syngenta products that Syngenta disclosed to UPL in the parties’ negotiations. That continuation application has now issued as the ’625 patent. These facts and others have created a reasonable apprehension for Syngenta that if they were to so market in the United States, UPL would sue for patent infringement of the ’727 and/or ’625 patents.

**JURISDICTION AND VENUE**
**(Declaratory Judgment of Unenforceability and Invalidity)**

40. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as Syngenta’s claims arise under the laws of the United States, 28 U.S.C. § 1338, which provides that district courts have original jurisdiction over any civil action arising under any Act of Congress relating to patents, and 28 U.S.C. § 2201.

41. This Court has personal jurisdiction over UPL Ltd. as provided in 35 U.S.C. § 293:

> Every Patentee not residing in the United States may file in the Patent and Trademark Office a written designation stating the name and address of a person residing within the United States on whom may be served process or notice of proceedings affecting the patent or rights thereunder. If the person designated cannot be found at the address given in the last designation, or if no person has been designated, the United States District Court for the Eastern District of Virginia shall have jurisdiction and summons shall be served by publication or otherwise as the court directs. The court shall have the same jurisdiction to take any action respecting the patent or rights thereunder that it would have if the patentee were personally within the jurisdiction of the court.

42. UPL Ltd. carries out continuous and systematic activities within this jurisdiction by filing and prosecuting patent applications in the United States Patent and Trademark Office; as such UPL Ltd. does business in a continuous and comprehensive manner within the jurisdiction creating personal jurisdiction.

43. Venue is proper in this Court with respect to UPL Ltd. pursuant to 28 U.S.C. § 1391(b) and 28 U.S.C. § 1400(b) because UPL Ltd is not a resident of the United States and thus venue is appropriate in any judicial district.

44. As set forth herein, an immediate, real, and justiciable controversy exists between Syngenta and UPL Ltd. regarding the invalidity and unenforceability of the '727 patent and the '625 patent.

**JURISDICTION AND VENUE**
**(Antitrust Violations)**

45. This claim arises under Section 2 of the Sherman Act, 15 U.S.C. § 2, and seeks declaratory relief and damages for injury arising out of violations of the antitrust laws of the United States pursuant to 15 U.S.C. § 15, and 28 U.S.C. § 2201.

46. This Court has subject matter jurisdiction over this matter and personal jurisdiction over UPL Ltd., UPL Corp., and UPL NA pursuant to 15 U.S.C. §§ 4, 15, 22 and 26, and 28 U.S.C. §§ 1331 and 1337.

47. Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and (c) and 15 U.S.C. § 22 because UPL Ltd., UPL Corp., and UPL NA transacts business, can be found, or has availed itself of the courts in this judicial district by purposeful conduct in or directed to this district, such as soliciting or selling products, either directly, through related entities, or through their agents.

48. UPL moves substantial volumes of products sold across state lines. UPL is engaged in and its activities substantially affect interstate commerce.

## ADDITIONAL FACTUAL ALLEGATIONS

49. All parties and individuals involved in proceedings before the USPTO's Patent Trial and Appeal Board ("PTAB") have a duty of candor and good faith to the Office. 37 C.F.R. 11.303, 42.11(a). All practitioners are also required to certify the veracity of representations made to the PTAB. 37 C.F.R. 11.18(b)(2), 42.11(c). Further, the duty of candor to the Office requires practitioners to disclose information necessary to comply with the duty of disclosure. 37 C.F.R. 11.303(e).

50. As part of complying with the duty of candor, parties must also disclose relevant information that is inconsistent with a position advanced by the party during the proceeding. 37 C.F.R. 42.11. Further, every paper submitted to the PTAB requires a certification statement and requires a reasonable inquiry to show "the paper is not being presented for any improper purpose, such as to … needless[ly] increase [] the cost," "factual contentions have [or are likely to have] evidentiary support," and "denials of factual contentions are warranted." 37 C.F.R. 11.18(b)(2).

51. The named inventors, UPL, and/or their representative patent attorneys (collectively "UPL Applicants") failed to satisfy their duty of candor and good faith, including their duty of disclosure, to the USPTO during prosecution of the application that ultimately issued as the '727 patent and the prosecution of the application that issued as the '625 patent by both intentionally concealing material information from the USPTO as well as misrepresenting material information before the USPTO.

### A. UPL's Reliance on Fabricated Field Trial Data in Obtaining the '727 Patent

52. On November 4, 2016, UPL filed the '727 foreign priority application: Indian

Patent Application 201631037704 ("'704 application"). The '704 application contained no experimental results in support of statements of unexpected synergy. However, upon conversion to the PCT application on October 30, 2017, UPL amended the application to include a description of purported trials and data in support of UPL's claims of unexpected synergy. These purported field trials included the application of Syngenta's proprietary benzovindiflupyr fungicide, which Syngenta had released in late 2015:

| Treatment | Dose rates (ml/g/ha) | Mean percent disease control 2015/16 | 2016/17 |
|---|---|---|---|
| Prothioconazole + Benzovindiflupyr | 150 + 200 | 88.04 | 71.04 |
| Prothioconazole + Benzovindiflupyr + Mancozeb | 150 + 200 + 1500 | 95.07 | 95.07 |
| Prothioconazole + Isopyrazam | 150 + 1000 | 87.14 | 70.23 |
| Prothioconazole + Isopyrazam + Mancozeb | 150 + 1000 + 1500 | 93.4 | 93.07 |
| Prothioconazole + Penthoipyrad | 150 + 1000 | 83.33 | 68.15 |
| Prothioconazole + Penthiopyrad + Mancozeb | 150 + 1000 + 1500 | 93.07 | 92.18 |

Table 1 clearly demonstrates the increase in control when mancozeb is added to the combination of ergosterol biosynthesis inhibitors and succinate dehydrogenase inhibitor fungicides.

'727 patent, col. 20, lns 40-63.

| Treatment | Dose rates (ml/g/ha) | Mean percent disease control 2015/16 | 2016/17 |
|---|---|---|---|
| Prothioconazole + Benzovindiflupyr + Azoxystrobin | 150 + 200 + 500 | 93.07 | 91.07 |
| Prothioconazole + Benzovindiflupyr + Azoxystrobin + Mancozeb | 150 + 200 + 500 + 1500 | 96.36 | 95.03 |

Table 2 clearly demonstrates the importance of adding mancozeb to the combination. The addition of mancozeb improved disease control.

*Id.*, col. 21, lns 1-14.

53. The data was accompanied by assertions that "[e]xperiments were conducted over a period of two years to study the effect of the addition of dithiocarbamates on the efficacy of succinate dehydrogenase inhibitors alone and when combined with a co-fungicide such as Quinone outside inhibitors and/or ergosterol biosynthesis inhibitor fungicide…. The combinations were tested for efficacy of disease control in soybean for the control of Asian soybean rust. The trials were carried out at various locations in India." '727 Patent, col. 20: 21-26, 20:30-32.

54. The '727 application, as amended to include the above purported field trial data and assertions about that data, was accompanied by a sworn inventor oath declaring that the application was "made or authorized to be made by me," that "I have reviewed and understand the contents of the application," and that "I am aware of the duty to disclose to the United States Patent and Trademark Office all information know to me to be material to patentability." The '727 inventors who signed the oath and declaration were Carlos Eduardo Fabri, Rajju Devidas Shroff, Jaidev Rajnikant Shroff, and Vikram Rajnikant Shroff. On information and belief, Mr. Rajju Devidas Shroff is also the founder and served as the Chairman and Managing Director of UPL Ltd. during the pendency of and issuance of the ' 727 patent (https://www.upl-ltd.com/investors/chairman-emeritus). His sons, Mr. Jaidev Rajnikant Shroff (https://www.upl-ltd.com/jaishroff) and Mr. Vikram Rajnikant Shroff (https://www.upl-ltd.com/vikramshroff), serve as executives with UPL Ltd. Mr. Jaidev Shroff serves as the Chairman of the Board and the Group Chief Executive Officer of UPL Ltd. Mr. Vikram Shroff serves as a Director of UPL Ltd.

55. During prosecution of the '727 patent, the Examiner rejected the claims as, inter alia, being unpatentable over WO 2015079334 "Oliveira". In overcoming this rejection, UPL

relied on the purported trial data in a response filed April 22, 2021, and signed by patent prosecution counsel, Karen A. LeCuyer of Cantor Colburn LLP, emphasizing:

> The technical effects achieved by the claimed combinations, *i.e., **an enhancement of the efficacy, and a surprising reduction in fungal disease*** incidence when mancozeb is added to the claimed combinations. [sic]

(emphasis added). The Examiner responded by dropping the rejection in the next Office Action, and the '727 patent issued on September 20, 2022.

56. The purported trial data was material to patentability, as demonstrated by the withdrawal of the rejection in the Office Action after UPL submitted the purported trial data.

57. Since the issuance of the '727 patent, Syngenta has determined that the purported field trials very likely were never conducted and, thus, the field trial data that UPL relied upon to obtain issuance of the '727 patent was very likely fabricated. On information and belief, one or more of the inventors and UPL officers identified above and/or their representative patent attorneys as identified above and on the face of the '727 patent, were aware, at the time the application was amended to include the field data and at the time the Applicants relied on the field data to overcome an Examiner rejection, that the purported field trials had never taken place and that the reported data was fabricated.

58. The purported field trials, as disclosed in the '727 specification, used Syngenta's patented and newly registered active ingredient Solatenol® (benzovindiflupyr), which as of February 2015, was only registered in Brazil and Paraguay and had an expected registration date only in the U.S. Benzovindiflupyr was not registered for use in India during the 2015/2016 growing season or the 2016/2017 growing season.

59. Based on further investigations into the matter, Syngenta has determined that the regulatory approvals that would have been required for the trials were never obtained.

60. The '727 specifically states the "trials were carried out at various locations in India" using "Monsoy 9144 RR". '727 patent, col. 20, lns. 31-34. Monsoy 9144 RR is a genetically modified soybean that is not approved for use in India.

61. Moreover, there is no record of UPL having sought the necessary Indian government approvals to conduct the purported trials using the genetically modified (GM) cultivar "Monsoy 9144 RR" (as described in the specifications). Nor is there a record of UPL having reported its use of benzovindiflupyr in the purported trials as would be required given that benzovindiflupyr is not approved for domestic use in India.

62. To carry out an experimental trial involving GM (genetically modified) seed, such as Monsoy 9144 RR in India, whether for export, domestic production, or research, ultimately requires approval by the Genetically Engineered Appraisal Committee ("GEAC"). The GEAC is a function of the Indian Ministry of Environment, Forests, and Climate Change of India. The GEAC maintains information utilizing genetically modified seeds, even for experimental field trials. There is no listing in the GEAC as to there ever having been a trial in India involving any genetically modified seed such as Monsoy 9144 RR.

63. The Review Committee on Genetic Manipulation ("RCGM") established under the Department of Biotechnology, Ministry of Science and Technology monitors the safety of on-going research projects and activities involving genetically engineered organisms for research. There is no evidence of UPL ever applying to the RCGM for approval of Monsay 9144 RR. Nor is there any evidence of UPL ever applying to the National Bureau of Plant Genetic Resources ("NBPGR") for an import permit for Monsoy 9144 RR. It would have been illegal for UPL to have conducted trials with Monsoy 9144 RR in India without coordination, approval, and submissions to the GEAC and/or RCGM and NBPGR.

64. UPL's reliance on the fabricated field trial data to show a purported "enhancement of the efficacy, and a surprising reduction in fungal disease …" resulted in the Examiner's allowance of the claims. Thus, UPL's reliance on field trial data it knew was fabricated to support purported "surprising" results was material to the issuance of the '727 patent. A reasonable Examiner would not have allowed the claims if they had been so informed.

**B. UPL's Failure to Disclose Material Prior Art**

65. During prosecution of the '727 patent, the UPL Applicants also failed to disclose, for example, the Godoy publication ("Efficiency of multisite fungicides in controlling Asian soybean rust, *Phakopsora pachyrhizi*, in the 2015/16 harvest: summarizing results of cooperative trials," authored by Godoy et al. in Londrina, PR August 2016 (Embrapa Soja, Circular Tecnica, 121)) despite having previously referred to it in a related patent family (Oliviera patent) prosecution of which two of the '727 inventors were also inventors on the Oliviera patent.

66. On information and belief, at least Jaidev Shroff and Vikram Shroff, inventors of both the '727 patent and the Oliviera patent, were aware of the Godoy publication and failed to disclose it during prosecution of the '727 patent. On information and belief, the Godoy publication was also known to Karen LeCuyer, the attorney prosecuting the '727 patent on behalf of UPL, as explicit reference and discussion was made by UPL of the Godoy publication in a declaration filed by UPL on June 27, 2019. Godoy was more material to patentability than any references the Examiner had before her. Indeed, the PTAB subsequently determined in the PGR proceeding (see below) that the Godoy reference anticipated claims 1, 3-5, 7, 9, and 10 of the '727 Patent. The PTAB also found that the combination of Godoy and Oliviera made claim 2 obvious and unpatentable.

67. A reasonable examiner aware of the Godoy publication would not have allowed the claims, if they had been so informed. This is confirmed by the PTAB PGR Decision of July 26, 2024 finding claims 1, 3-5, 7, 9, and 10 unpatentable as anticipated under 35 U.S.C. § 102 (a)(1) by Godoy.

### C. UPL's Violation of Its Duty of Candor and Good Faith During the PGR Proceeding for the '727 Patent

68. During the subsequent PGR proceeding for the '727 patent, UPL (its inventors and officers as identified above and/or their representative patent attorneys) again failed to disclose that the purported field trials described in the '727 specification were, in fact, never conducted. Moreover, UPL cited and relied upon the purported field trial data in its Preliminary Response, Response, and the Declaration of its expert, Dr. Jacobsen.

69. On January 31, 2023, Syngenta filed its Petition for PGR indicating, inter alia: 1) Godoy anticipated the claimed invention; 2) Tobler anticipated the claims; 3) Oliviera renders the claims obvious; and 4) the alleged unexpected results of the purported trials were not only expected but were also not reproducible (as supported by two years of Syngenta field trials described in the Prates Declaration accompanying the Petition for PGR).

70. On May 8, 2023, UPL filed its Preliminary Response to Syngenta's Petition for PGR and, rather than acknowledge that the purported trials had never taken place, UPL relied on the trials and asserted: "The '727 Patent Discloses Novel Fungicidal Combinations with *Unexpected Advantages."* (emphasis added). In further support, UPL cited and relied on the purported field trials described in the '727 Patent: "as explained *in the specification,* the disclosed combinations exhibited *surprising and unexpected* advantages …" (emphasis added). On July 31, 2023, the PTAB instituted PGR 2023-00017.

71. On November 9, 2023, UPL filed their Patent Owner's Response and reiterated

the assertion that "[t]he '727 patent provided 'surprising and unexpected advantages …" Again, at no point in the PGR proceedings did UPL inform the PTAB that the purported trials in the '727 Patent, which led directly to the parties focus on synergy, had never occurred.

72. Given the importance and relevance UPL placed on "surprising" results to the patentability of the claims, Syngenta requested discovery of the data underlying the '727 patent's disclosure of the purported trials. In opposing that discovery, UPL again failed to disclose that the field trials had never taken place. Instead, UPL misled the PTAB and Syngenta by representing only that it "investigated" and "searched" but was "unable to locate data relating to the trials." In addition, UPL refused to respond to Syngenta's request for confirmation that the "testing was actually performed" or to clarify whether the resulting data was lost or ever existed. The PTAB then relied on UPL's misrepresentations in denying Syngenta's requested discovery.

73. Finally, in its effort to oppose discovery into the purported trials, UPL for the first time in the proceeding affirmatively withdrew any "substantive reliance" on the purported trials disclosed in the '727 Patent. This withdrawal of reliance came after a full year of PGR litigation including depositions, nearly nine months after UPL first relied on the purported trials and began touting the surprising and unexpected results in the '727 patent PGR proceeding, and over two years after relying on the purported trials during prosecution to obtain issuance of the patent.

74. Prompted by UPL's reported inability to "locate data relating to [the] trials," refusal to respond to Syngenta's inquiry as to whether the testing was actually performed, and sudden withdrawal of any substantive reliance on data from the trials, Syngenta conducted further investigations into the purported field trials leading to its conclusion, as recounted above, that the field trials very likely were never conducted and, thus, the field trial data was fabricated.

75. During the PGR proceeding, UPL also failed to disclose that its expert's use and

application of the Colby formula was counter not only to established scientific practice but also to how UPL had used and represented the formula to other patent offices, such as India, in related patent prosecutions; a fact that UPL withheld from its expert in order to further misleading arguments.

76. During the PGR proceeding, UPL also failed to disclose declarations from one of its scientists, Dr. Oliveira, submitted during prosecution of the related Oliveira family of patents, which share inventors with the ’727 patent family. These declarations show Dr. Oliviera’s use of the Colby formula in a manner fundamentally inconsistent with that of UPL’s expert, Dr. Jacobson. The Oliveira declarations also demonstrated UPL’s understanding and acknowledgement that the prior art reference, Godoy, was published before the priority date of the ’727 patent. UPL failed to disclose this admission during the PGR when it took a directly contrary position, asserting that Godoy was not published before the priority date of the ’727 patent.

77. UPL’s conduct, during both the prosecution of the ’727 patent and the PGR proceeding, including misleading statements, misrepresentations, omissions, and failure to reasonably inquire, demonstrate an intent to knowingly commit fraud in its attempt to deceive the USPTO and the PTAB in an effort to obtain and maintain the ’727 Patent.

### D. UPL’s Inequitable Conduct in Obtaining the Allowance of the 12,402,625 Patent

78. On December 22, 2020, UPL filed a continuation application to the ’727 patent; application serial number 17/130,193. The continuation application includes the disclosure of the same fabricated field trial data disclosed in the ’727 patent. Allowed claim 1 of the issued ’625 patent reads: A fungicidal combination consisting of: mancozeb, prothioconazole, and benzovindiflupyr. The ’625 patent, like that of the ’727 patent, was accompanied by an inventor

oath and declaration signed by Carlos Eduardo Fabri, Rajju Devidas Shroff, Jaidev Rajnikant Shroff, and Vikram Rajnikant Shroff. On information and belief, one or more of these individuals were aware at the time that the purported field trials had never taken place and the reported data was fabricated.

79. During the prosecution of this claim, UPL again relied on the fabricated field trial data in the specification to overcome an Examiner rejection. In fact, three consecutive responses were submitted by UPL relying on the alleged trials without disclosing that the trials had never taken place. Peter Hagerty of Cantor Colburn filed two; one on February 17, 2023, and a second on October 19, 2023 (citing the alleged trials at page 5 of his response). Not only did Mr. Hagerty point to and rely on the fabricated data in the specification, he also did not disclose the PGR Petition filed by Syngenta wherein Syngenta not only criticized the trial data, but also provided two years of field trials demonstrating that the purported UPL trial data could not be duplicated. Mr. Hagerty relied on the alleged trials as he viewed the trials as material to overcoming the obviousness rejections to the claims. As such, he had an obligation to disclose the arguments presented by Syngenta in the PGR Petition criticizing the UPL data as well as the Prates Declaration submitted by Syngenta with the PGR Petition disclosing the two years of field trial data carried out by Syngenta. In her Office Action of January 25, 2024, the Examiner criticized the UPL trial data relied on in the specification as incomplete. Not to be deterred, UPL filed a third response July 22, 2024, signed by Joseph Romagnano again relying on the fabricated trial data in the specification. Joseph Romagnano also did not disclose the PGR Petition criticizing the UPL data or the Prates Declaration submitted by Syngenta with the PGR Petition disclosing the two years of field trial data carried out by Syngenta. In her Office Action of

November 12, 2024, the Examiner again criticized the trial data of the UPL specification and even referred to the PTAB Final Decision of the ’727 patent.

80. Over the course of the next two years UPL continued to prosecute the claims of the ’625 application, concurrent with the ’727 PGR proceeding. After the PTAB decision of July 26, 2024, in the PGR, UPL then filed a Response in the ’625 prosecution containing the Declaration of Anton Berger Neto on March 12, 2025; this response was signed and submitted by Joseph Romagnano. Again, attorney Romagnano did not disclose the PGR Petition criticizing the UPL data or the Prates Declaration submitted by Syngenta with the PGR Petition disclosing the two years of field trial data carried out by Syngenta. Nor did Mr. Romagnano disclose that the field trial data disclosed in the ’625 specification was fabricated. The Neto Declaration referred to purported new trials conducted in 2021/2022 and 2022/2023 and asserted the trials demonstrated synergy. Tables 1 and 2 present data referring to the combination of ingredients falling within claim 1 of the ’625 patent. Subsequently, the Examiner issued a Notice of Allowance of the claims mailed May 16, 2025.

81. Despite the fact that UPL argued and relied on the purported data of the specification as well as the data contained within the Neto Declaration as demonstrating synergy, at no time did UPL disclose to the Examiner: 1) the PGR Petition that Syngenta filed against the ’727 patent, which is the parent application to the ’625 patent; 2) that the purported field trials of the specification did not take place; 3) that there existed two years of field trial data in the Prates Declaration submitted by Syngenta in the PGR proceeding that directly contradicted the Neto Declaration; 4) that the results of the Neto Declaration had been challenged and criticized upon its submission to the Brazilian Patent Office (“BRPTO”); and 5) the PTAB Final Written

Decision of July 26, 2024 in the PGR finding all claims either anticipated by Godoy and by Tobler or obvious in light of the Oliviera patent disclosure.

82. The Neto Declaration submitted by Romagnano in the response of March 12, 2025, was determinative to patentability for the Examiner as she specifically noted this in her Reasons For Allowance where she pointed out that "Applicants have also submitted a Declaration showing superior and unexpected benefits from this combination." The Neto Declaration resulted in the allowance of the claims. The Examiner was unaware of the Syngenta Prates Declaration or its described two years of field trials. A reasonable Examiner would not have allowed the claims if they had been so informed.

### E. Markets Relevant to UPL's Anticompetitive Conduct

83. There are two product and two geographic markets relevant to assessing the effects of UPL's anticompetitive conduct challenged in this Action.

#### Multisite fungicide markets

84. A relevant antitrust product market is the production and sale of multisite fungicides, and particularly mancozeb, for crop protection.

85. Fungicides are a specific type of crop protection product used to inhibit or kill some fungal pathogens. Fungicides differ from other crop protection treatments because, among other ways, fungicides possess unique modes of action to control pathogens, including cell membrane disruption, interfering with metabolic processes, or targeting and inhibiting enzymes or proteins critical for pathogen survival and function.

86. Multisite fungicides are distinct from single-site fungicides. Single-site fungicides have the ability to target only one specific site in the pathogen, while multisite fungicides have the ability to target several sites. The use of single-site fungicides presents medium to high risk for resistance development within a population, while the use of multisite

fungicides provides comparatively less risk for resistance development as they target more than one site in the fungus.

87. Industry participants, including UPL, recognize that multisite fungicides differ from single-site fungicides. UPL is organized into a “crop protection” business unit, separate from its “seeds” and “biosolutions” units. Its crop protection unit distinguishes fungicides from other forms of crop protection products, and it also distinguishes between multisite and single-site fungicides, based on multisite fungicides “targeting many metabolic sites,” resulting in “lower risk of causing the development of fungicide resistance.”

88. Multisite fungicides potentially available for crop protection purposes are, on information and belief, synthesized or formulated from one of two active ingredients: Mancozeb or chlorothalonil.

89. Mancozeb and chlorothalonil, however, are not substitutable active ingredients for crop disease control uses. The use of chlorothalonil is prohibited by regulators in many countries where mancozeb is permitted. For example, the European Union has prohibited the use of chlorothalonil while mancozeb is permitted. Switzerland, New Zealand, Canada, Costa Rica, and the UK also have chlorothalonil prohibitions.

90. These prohibitions are premised on, among other reasons, environmental-related concerns with chlorothalonil use. The European Union, to illustrate, has classified chlorothalonil as a presumed human carcinogen, and the European Union, like many other countries, also has cited concerns with chlorothalonil groundwater contamination. Additional countries, including Brazil, are actively investigating the near-term prohibition of chlorothalonil.

91. Mancozeb can protect crops against diseases that chlorothalonil cannot control effectively. Chlorothalonil can injure some plants, and it is ineffective against certain pathogens

compared to mancozeb. In the industry, mancozeb is preferred over chlorothalonil, or it is not limited by regulators, for applications with a variety of fruits and fruit trees.

92. In the marketplace, mancozeb and chlorothalonil primarily are used for different purposes. About 70% of the chlorothalonil used in the United States is applied to golf courses, according to the EPA, and about another 17% of U.S. chlorothalonil applications are for residential trees and shrubs. In contrast, the vast majority of mancozeb used in the United States—90% or more—is applied to agricultural crops such as corn, potatoes, and wheat according to the EPA

93. The separate and distinct uses of fungicides formulated from mancozeb and chlorothalonil reflect that they are not functionally equivalent for crop disease control. Nor are they generally utilized or viewed by end users as reasonably interchangeable, when considering prices, for controlling crop diseases.

94. Industry participants, including UPL, thus recognize mancozeb as a uniquely effective multisite fungicide for the prevention of plant diseases across a range of crops, including rice, soybean, wheat, onions, potatoes, and other vegetables and fruits. In a recent statement, UPL acknowledged the "vital" and "crucial" role of mancozeb as a multisite fungicide, and also recognized it as "a foundational technology for disease protection in plants."

95. Consumers similarly recognize mancozeb as a distinctively effective product for protecting crops. A recent UPL press release quotes consumers and consumer advocates acknowledging mancozeb's unique effectiveness compared to other crop protection products, and acknowledging that an inability to use mancozeb would adversely impact their ability to protect against disease while managing resistance.

96. Consumers do not consider other fungicides or crop protection products to be

reasonable substitutes for mancozeb. A recent UPL press release quotes consumer advocates: "Without mancozeb, farmers are forced to use alternative products that are costlier and require higher volumes." UPL also quotes consumers stating that they have "lost whole crops" when mancozeb is unavailable, and "[w]ithout mancozeb, farmers are applying 2-3 times more fungicides, significantly increasing costs."

97. A recent UPL press release quotes a consumer representative acknowledging that there is no "solution" other than mancozeb for protecting against some diseases and, absent mancozeb, consumers would shift to other crops or could stop producing crops. Other fungicides or crop protection products are not functionally equivalent to mancozeb, for comparable cost, because they are not as effective in protecting against disease while managing resistance.

98. Multisite fungicides are marketed and sold at prices that differ from prices for other crop protection products, on information and belief. In recent years, UPL has repeatedly told its investors that it is selling fungicides, and especially mancozeb, at prices relatively better than its prices for other crop protection products.

99. Single-site fungicides and non-fungicide crop protection products generally also are not considered by consumers as environmentally friendly equivalents to multisite fungicides, because those other products, unlike multi-side fungicides, can sometimes impact nontarget species.

100. The relevant antitrust geography for the production and sale of multisite fungicides, and particularly mancozeb, is worldwide or, alternatively, each of the United States and/or Brazil.

101. Multisite fungicides can be produced in, transported to, and sold in any country in the world where it is permitted by government and regulatory authorities (referred to as

"worldwide"). Customers can purchase and use multisite fungicides in countries worldwide, where permitted, and sellers of multisite fungicides would, in unrestrained markets, compete worldwide to sell the product.

102. The worldwide market is consistent with commercial realities. Multisite fungicides, including Mancozeb, are produced on multiple continents in countries like China, India, Germany, Colombia, and Brazil, and multisite fungicides are distributed and sold to consumers in numerous countries around the globe. Suppliers of multisite fungicides, including UPL, operate on a worldwide basis.

103. The worldwide market also is recognized by industry participants. UPL represents on its corporate website that it is a global provider of crop protection products, with sales in almost 140 different countries. UPL also tracks and reports sales of multisite fungicides on a worldwide basis. UPL also contracted to sell mancozeb to Syngenta in nearly 100 countries, including in both the United States and Brazil.

104. In a competitive market, purchasers of multisite fungicides, and especially mancozeb, would respond to price increases for it by turning to alternative suppliers sourcing lower cost products, even if they were located in other countries, as permitted by governments and regulatory authorities.

105. Alternatively, the United States and/or Brazil each is a narrower geographic area, or submarket, in which to evaluate UPL's conduct. A significant portion of worldwide multisite fungicides, and especially mancozeb, sales are made to customers in the United States and Brazil.

106. United States and Brazil markets are distinct from other areas worldwide. Each of the United States and Brazil regulate multisite fungicides according to their own laws and

regulations, and the production and sale of multisite fungicides are subject to the laws and regulations specific to each of the United States and Brazil. Purchasers of multisite fungicides located in each the United States and Brazil could not practicably defeat price increases for that product by turning to suppliers located outside of their respective countries due to such laws and regulations precluding the sales of impermissible products. However, those U.S. and Brazilian purchasers could turn to other suppliers located in their respective countries which are permitted to supply multisite fungicides.

107. Similarly, multisite fungicides are marketed and sold at different prices in the United States and Brazil, on information and belief; market participants, including UPL separately track and report prices and sales of mancozeb in the United States and Brazil; and multisite fungicides are used primarily for protecting different types of crops in the United States and Brazil. These commercial differences further practically indicate the United States and Brazil as separate economic regions for multisite fungicides, and for mancozeb in particular.

**Mancozeb+ combinations market**

108. The second relevant antitrust product market is the production, sale, or use of a fungicidal mixture containing mancozeb, benzovindiflupyr, and at least one other fungicide (referred to as "mancozeb+ combinations") for crop protection.

109. Mancozeb+ combinations is a product distinct from other crop protection products or fungicides used in isolation. Mancozeb+ combinations provide not only effective disease control, but also decreased risk for resistance development.

110. In applying for the '727 patent, UPL admitted that a fungicidal mixture containing mancozeb, benzovindiflupyr, and at least one other fungicide is distinct from other fungicides and crop protection products because they, among other reasons, do not offer an equivalent

breadth of disease control spectrum that combines curative and preventative actives at comparable dosage rates.

111. Industry participants recognize mancozeb+ combinations products as distinctive, including by UPL, as referenced above, seeking patent production for this product, demanding licensing royalties for the product at rates specific to the product, and demanding distribution terms for the product at sales prices specific to the product.

112. In seeking to enforce the ’727 patent, both by demanding licensing royalties for mancozeb+ combinations products and by threatening patent infringement actions for those products, UPL also admitted that a fungicidal mixture containing mancozeb, benzovindiflupyr, and at least one other fungicide is distinct from other fungicides and crop protection products.

113. Purchasers of mancozeb+ combinations could not practicably respond to a small but significant non-transitory increase in price by switching to other fungicides or crop protection products due to barriers presented by UPL’s asserted ’727 and ’625 patents, and because those other products are not as effective in protecting against diseases, require more or additional costly applications, and often lead to increased risk of resistance development within a population. UPL admitted such distinctions in applying for the ’727 patent, and again in applying for its continuation.

114. The relevant antitrust geography for the production, sale, or use of mancozeb+ combinations products is the United States.

115. The U.S. geographic market is defined by government regulation. Extensive legislation and regulation by EPA and similar state government entities have resulted in U.S.-specific labelling, usages, and applications for crop protection products, which are applicable to mancozeb+ combinations products. No other government approved product exists that is

permitted and reasonably interchangeable with mancozeb+ combinations for protecting crops in the United States for the reasons UPL admitted in its patent applications as summarized above.

116. The U.S. geographic market is consistent with commercial realities. Producers and suppliers would necessarily have to make and sell mancozeb+ combinations products in compliance with U.S. laws and regulations, and specific to the customers using the product in the United States. Consumers like agricultural farmers could not turn to sellers outside of the United States, as these consumers would be precluded by laws and regulations from importing and using in the United States non-U.S. government approved and compliant mancozeb+ combinations products.

117. Additional practical indicia show a U.S. market. Government approved mancozeb+ combinations products could be marketed and sold throughout the United States. It is common industry practice for nationally distributed crop protection products to be priced on a national basis. The products also could be transported and distributed to end users located throughout the United States. Nutrien Ag Solutions, for example, distributes crop protection products, including Syngenta's, from hundreds of locations across the United States.

118. In a competitive market, purchasers in the United States of a U.S. government approved mancozeb+ combinations products would not respond to price increases by turning to foreign suppliers of products that are not compatible for sale or use in the United States.

119. In addition to their distinctive characteristics referenced above, purchasers of mancozeb+ combinations products located in the United States could not practicably turn to suppliers located outside of the United States due to UPL's asserted U.S. patents and UPL's tactics undertaken to enforce those patents.

**F. UPL's Power in the Relevant Markets**

120. The production and sale of multisite fungicides, and especially mancozeb, is a concentrated market. A few firms—only four to five on information and belief—control nearly all the worldwide production and sales. Of them, UPL is by far the largest producer and seller of mancozeb, possessing a substantial share of that market.

121. UPL possesses about 50% of the worldwide mancozeb production capacity, on information and belief. UPL also controls about 40% of the worldwide mancozeb sales. UPL's public releases acknowledge its dominant leadership position in the worldwide production and sale of mancozeb.

122. UPL's control of the production and sale of mancozeb is increasing, including due to its 2024 acquisition of Corteva's mancozeb business as explained below.

123. UPL also is able to control mancozeb prices. UPL has profitably imposed mancozeb price increases in the past two years, with UPL's executives recently admitting that UPL is able to profit from significant increases of mancozeb prices on a global basis. In 2024 and 2025, UPL reported to investors that its mancozeb prices and revenues robustly increased, while its prices and revenues for other products decreased or were stable.

124. UPL's control of the production and sale of mancozeb is reinforced by its dominance in key countries. UPL controls about 50% and 60% of the mancozeb sales in the United States and Brazil, respectively, on information and belief, which are among the world's largest agricultural producing countries, with key crops and customers that account for at least a third of mancozeb sales worldwide, on information and belief.

125. Even if, alternatively, multisite fungicides markets were to consist of mancozeb and chlorothalonil, UPL would possess a substantial share of such markets. UPL produces and

sells multiple chlorothalonil products. It would possess 35-40% or more of the sales worldwide and in the United States and Brazil, on information and belief.

126. UPL's power in the relevant markets has been protected by substantial barriers to entry. The construction of new or reconfiguration of existing facilities to produce multisite fungicides capable of competing with UPL would require, even if permitted by government authorities, on information and belief, multi-year commitments of resources and multi-million-dollar investments of capital.

127. UPL's power is further protected by government and regulatory barriers. Governments worldwide regulate the production of multisite fungicides, requiring a variety of environmental and production permits and approvals that, on information and belief, can take years to obtain, if ever at all. For these reasons, on information and belief, mancozeb is not produced in the United States.

128. Likewise, the technical expertise and manufacturing know-how necessary to produce quality multisite fungicides at competitive costs would require, on information and belief, additional years of pre-production testing and accumulation of production experience.

129. A potential competitor also would need government authorization as a predicate to selling multisite fungicides for consumer use. For example, in the United States, like other countries, prospective sellers of multisite fungicides would need EPA's permission to sell them and EPA's registration approval for how consumers may use them. Obtaining these necessary permissions would require, on information and belief, additional time and substantial investments of resources.

130. Non-government organizations ("NGO") are further barriers. NGOs frequently contest government approvals of crop protection products, as well as challenge the continuation

of government permissions. In this industry, NGOs increase the time and cost for the entry of potential competing crop protection products.

131. UPL's dominance in the relevant markets has been further solidified as a consequence of its inequitable conduct before the USPTO and additional exclusionary conduct summarized herein.

132. A hypothetically successful entrant also would have to develop a customer base of sufficient magnitude to support the substantial investments in entering the relevant markets. UPL's existing dominance, plus its inequitable and exclusionary conduct, on information and belief, would hinder or prevent an entrant from attracting a meaningful number of customers to overcome these barriers, particularly in the key countries (United States and Brazil) where UPL is especially entrenched.

133. UPL also controls about 100% of the production, sale, or use of a fungicidal mixture containing mancozeb, benzovindiflupyr, and at least one other fungicide in the United States ("mancozeb+ combinations"), on information and belief.

134. UPL has achieved and has maintained a monopoly in the mancozeb+ combinations market for years through inequitable conduct before the USPTO and additional exclusionary conduct summarized herein. UPL has asserted fraudulently obtained patents and wielded its power to exclude actual and potential competitors, such as Syngenta, from the market as a confirmation of UPL's monopoly power.

135. UPL's power in the mancozeb+ combinations market has been protected by substantial barriers similar to all those protecting the multisite fungicides market, including multi-year and multi-million-dollar investments in product development and production facilities, substantial time and expense to obtain government production permits and sales

permissions and to resolve NGO disputes, and the difficulty of establishing a sufficient magnitude of customers, particularly in key countries like the United States and Brazil.

136. A potential competitor that could hypothetically clear those barriers would also face UPL's assertion of fraudulent patents to stop competition, in addition to its exclusionary conduct summarized below. Defending against UPL's litigation could cost millions of dollars more, and cause years of additional delay until free and fair competition in the U.S. mancozeb+ combinations market could be possible.

### G. Summary of UPL's Exclusionary Conduct

137. UPL has deployed a variety of related and self-reinforcing anticompetitive tactics for the purpose of UPL trying to achieve monopoly power in U.S., Brazil, and worldwide multisite fungicides markets, and for UPL achieving and maintaining monopoly power in the U.S. mancozeb+ combinations market.

138. UPL has achieved and maintained monopoly power in the U.S. mancozeb+ combinations market through the enforcement of patent rights knowingly obtained through inequitable conduct or fraud.

139. As summarized above, UPL obtained the ' 727 patent, which encompasses the U.S. mancozeb+ combinations market, as a result of inequitable or fraudulent conduct, and UPL has relied on more inequitable or fraudulent conduct while defending that patent in the PGR and in obtaining allowance of the '625 patent.

140. UPL also has asserted the inequitably or fraudulently obtained ' 727 patent against competitors in the United States, including by UPL representatives telling Syngenta that UPL's patent is "strong," and by implicitly and explicitly threatening Syngenta with crushing patent litigation if it were to sell mancozeb+ combinations products without UPL's permission.

141. Even after the PTAB's July 2024 decision finding many of UPL's ' 727 patent claims as unpatentable as explained above, UPL has continued to seek to prosecute them. UPL appealed to the U.S. Court of Appeals for the Federal Circuit, extending the duration of UPL's patent barriers to competitors, and increasing the costs and burdens on competitors, including Syngenta, in removing those improperly erected barriers.

142. UPL also has deployed litigation tactics that multiply the patent proceedings, to the further detriment of competition in the market. These tactics include, as explained above, years of misstatements and misrepresentations to the USPTO and PTAB to stymie challenges to UPL's asserted '727 patent, and UPL's eventual withdrawal of its "substantive reliance" on the fabricated trials, only after relying on them for a year of PGR litigation to prolong the proceedings to the detriment of Syngenta and competition.

143. This withdrawal of reliance came after a full year of PGR litigation including depositions, nearly nine months after UPL first relied on the purported trials and began touting the surprising and unexpected results in the '727 patent PGR proceeding, and over two years after relying on the purported trials during prosecution to obtain issuance of the patent.

144. UPL's assertion of the inequitably or fraudulently obtained '727 patent and '625 patent, has caused Syngenta to forego sales of its Solatenol®, Elatus®, and Mitrion™ products in combination with mancozeb and other fungicides. UPL's assertion also has caused Syngenta to undertake costly and disruptive oppositions to UPL's patent proceedings as summarized above.

145. UPL's efforts to enforce the '727 patent, on their own, constitute an anticompetitive exclusion of competition in the United States. Syngenta could not practicably sell mancozeb+ combinations products in competition with UPL when, as explained above,

doing so would subject Syngenta to substantial legal risks and financial injuries threatened by UPL. Nor is any other company selling the product in the United States. UPL's efforts in enforcing the '727 patent have succeeded in killing competition in the U.S mancozeb+ combinations products market for years.

146. Even if the '727 patent were not obtained by fraud, UPL's campaign of patent enforcement actions and defensive legal maneuvers would be anticompetitive.

147. At the very least, UPL knew the '727 patent was invalid for the reasons explained above. UPL's actions and maneuvers to enforce and defend a patent understood to be invalid are objectively baseless, and they are anticompetitive when, as here, they are done aggressively and repeatedly by UPL to harm and hinder a competitor, Syngenta, from competing freely in the U.S mancozeb+ combinations products market.

148. UPL's campaign of patent proceedings to protect its position in the relevant markets has extended to Brazil as well. There, UPL threatened to sue Adama for purportedly infringing the Oliviera patent, with claims for combinations of mancozeb with systemic fungicides. UPL followed through by launching two lawsuits alleging infringement against Adama in June and September of 2021. UPL's threats and litigation caused Adama to file multiple invalidity and non-infringement suits in 2021.

149. The Brazilian litigation was unleashed by UPL while it manipulated the process for its equivalent patent in Europe. During a February 2024 oral hearing in the European Patent Office on UPL's Oliviera equivalent patent (EP 3 073 826 B1), the Board of Appeal Opposition announced that UPL's claims are not inventive. UPL then withdrew the patent, avoiding a formal written decision, so UPL can keep forcing competitors to repeatedly expend effort and money in new lengthy legal challenges to claims UPL knows to be invalid.

150. Subsequently, UPL filed a divisional patent application, EP 4 014 738 B1. The pending claim features are essentially identical to the withdrawn patent, and only differ in that the originally granted four combinations of EP ’826 have one systemic fungicide replaced by another from the same group of fungicides already recited in the revoked ‘826. As such, UPL knows the method claim 1 of this divisional is not novel or inventive for the same reasons as the ’826. Despite this, UPL is filing multiple divisional applications in an improper attempt to try patenting essentially the same subject matter over and over.

151. In Brazil, as in the United States, UPL also has used its patents and litigation threats to try to force purchases of UPL’s mancozeb. In the lead up to UPL’s litigation against Adama, UPL offered Adama a license, and the potential to avoid UPL’s litigation, on the condition that Adama purchased its worldwide requirements of mancozeb from UPL, on information and belief. UPL also pressured Adama to help it compel Syngenta to purchase mancozeb from UPL.

152. UPL’s campaign of litigation has suppressed competition in the relevant markets, including by delaying and preventing the entry of competitors like Syngenta in the U.S mancozeb+ combinations market, distorting the competitive process in the multisite fungicides markets by coercing purchases of mancozeb with asserted patents and litigation, and by imposing litigation costs that drain resources of actual and potential competitors in the relevant markets.

153. The anticompetitive assertions and enforcements of patents have been reinforced by additional exclusionary acts. On belief, UPL has threatened other potential competing sellers of mancozeb+ combinations products with patent proceedings, UPL has threatened customers with the risk of patent lawsuits and damages if they were to purchase the products from others, UPL has disparaged Syngenta and its products and, in communicating with other potential

competitors and customers, UPL has withheld the material fact that its patents were procured by fraud. UPL's campaign of false communications and threats, on belief, has impeded Syngenta's ability to compete freely in the relevant markets.

154. UPL also has impermissibly leveraged the '727 patent and the '625 patent to try to achieve power in another market. As explained above, during 2022 and 2023, UPL repeatedly demanded that Syngenta purchase at least 70% and up to 100% of its mancozeb requirements from UPL, in order for Syngenta to have the "freedom to operate," i.e., be licensed by UPL to sell mancozeb+ combinations products.

155. UPL's demands constitute an anticompetitive leveraging of its purported patent rights to try to monopolize the mancozeb market, by seeking to require that Syngenta purchase all or most of its mancozeb requirements from UPL as a precondition for it allowing Syngenta to sell allegedly patent-protected mancozeb+ combinations products.

156. Its demands also constitute an anticompetitive broadening of the purported U.S. patent scope, by UPL requiring that Syngenta commit to purchasing all or most of its mancozeb requirements for regions outside of the United States, as a precondition for a license for U.S. sales of mancozeb+ combinations products.

157. This use of patents to coerce Syngenta into purchasing mancozeb from UPL is not competition on merit. Despite its dominance in the sales of mancozeb, UPL is not a dependable provider of quality mancozeb, as stated above. Nor does UPL sell mancozeb at competitive prices, considering the quality of its product and services. And Syngenta prefers multiple suppliers. UPL therefore has resorted to coercion to gain more mancozeb sales.

158. UPL's patent leveraging also resembles anticompetitive tying as part of its effort to monopolize, inasmuch as UPL is using its power over the U.S. mancozeb+ combinations

products market to require or force customers (Syngenta at least) to purchase mancozeb from UPL. Such economically forced purchases of mancozeb from UPL would strengthen its power in the mancozeb markets.

159. By restraining sales of mancozeb+ combinations products, UPL also has protected its power in the mancozeb market. As explained above, the combination of fungicides like Syngenta's Solatenol® and Elatus® with mancozeb increases crop protection efficacy and reduces disease resistance. The use of these combination products reduces the need for mancozeb applications, enabling end users to achieve equivalent or improved crop protection with significantly less quantity of mancozeb. In blocking or delaying mancozeb+ combinations products, UPL has artificially inflated and extended its sales of mancozeb.

160. As part of trying to monopolize the mancozeb markets, UPL also has eliminated its competitors. In April 2024 ULP completed its acquisition of Corteva Agriscience's solo mancozeb global fungicide business, with a few county exceptions not relevant to Brazil or the United States. Immediately prior to the acquisition, UPL recognized Corteva as one of its few competitors in crop protection products.

161. When UPL acquired Corteva's manocozeb business, UPL was the largest U.S. supplier of mancozeb, and Corteva was the second largest, with Corteva selling about 20% of the product in the United States, on information and belief. UPL recently admitted that its acquisition of Corteva "strengthen[s]" and "cements" its leadership in the mancozeb market.

162. Consistent with UPL's admission, this acquisition has substantially lessened competition in the mancozeb and/or multisite fungicides markets, and especially in the United States, by eliminating UPL's main competitor in an already highly concentrated market. The acquisition also reduces consumer choice and options by removing a potential alternative

supplier of mancozeb in the relevant geographic markets. UPL's elimination of its main competitor also removed the firm with the scale necessary to restrain prices for multisite fungicides, and especially for mancozeb, leading to increased and supracompetitive prices to consumers, on information and belief.

163. More recently, UPL seeks to further confound and deter competitors in the mancozeb and mancozeb+ combinations products markets through filings like the Neto family patent application (U.S. serial number 18/250, 410) where the only independent claim recites "a fungicidal combination comprising: (a) at least one multisite fungicide; and (b) at least three systemic fungicides."

164. UPL also has used restrictive contracting tactics to control the mancozeb and/or multisite fungicides markets. These tactics are particularly effective in these concentrated markets, in which there are few key purchasers of mancozeb and even fewer producers and suppliers of the product.

165. As evidenced by UPL's mancozeb contract with Syngenta, UPL sells mancozeb with long-term contracts, with durations of three or more years. These contracts also require 12-month or more notices of termination. UPL pursued and employed similarly restrictive terms in agreements with other customers, including Adama, on information and belief. These restrictive terms effectively lock in mancozeb purchasers with UPL for multiple years, while foreclosing potential competing suppliers of mancozeb.

166. The restrictive contracting tactics used by UPL, in combination with its other anticompetitive tactics, have substantially foreclosed the mancozeb+ combinations and mancozeb markets, on information and belief.

## H. Anticompetitive Effects and Injury Due to UPL's Conduct

167. UPL's efforts to preclude Syngenta and others from the relevant markets has distorted the proper functioning of competitive forces in the markets and has thwarted Syngenta's ability to compete vigorously for customers in the markets.

168. Customers of mancozeb and mancozeb+ combinations products in the relevant geographic areas have been deprived of choice of suppliers competing freely. This has decreased competition substantially to the detriment of consumers who are dependent on mancozeb for the efficient and profit-maximizing use of crop protections.

169. This also has harmed customers by quashing the supply of mancozeb+ combinations products in the United States, which has deprived U.S. consumers of the additional efficacy and profit-maximizing benefits of these products. The delayed deployment of mancozeb+ combinations products has increased risk for disease resistance development within crops, while also increasing the incidence of fungal diseases. Substantial values of crop losses could have been avoided, absent UPL's anticompetitive tactics.

170. Because of UPL's dominant position in the concentrated mancozeb markets, further solidified by the elimination of its main competitor (Corteva), among other anticompetitive conduct, UPL has been able to charge supracompetitive prices for mancozeb, resulting in further harm to customers and to the competitive process.

171. Since at least 2023, UPL has reported to investors that mancozeb is its leading product for generating revenue and profits. Since then, UPL has reported on repeatedly increasing or strengthening its mancozeb prices and margins, especially in Brazil and the United States, even when prices for other crop protection products were down or flat. For instance, in 2024 UPL reported increases in mancozeb prices and revenue, despite reporting a more than 30% drop in revenue and significant margin compression for its overall crop protection business.

172. As long as UPL's anticompetitive actions maintain its power in the mancozeb markets, customers in those areas will continue to be harmed by lack of choice for suppliers and the increasingly higher prices that UPL charges, which are incommensurate with any improvement to the product, and there would be very little recourse for them.

173. UPLs efforts to preclude Syngenta from the mancozeb+ combinations products market has delayed and precluded Syngenta's entry into the market and hindered its going-forward ability to compete vigorously for customers.

174. In a market free of UPL's anticompetitive conduct, Syngenta could and would have launched and expanded its mancozeb+ combinations products sales, and could and would have had substantially greater revenues and profits from those sales, consistent with its shares of sales of other crop protection products. Those greater sales and revenues also would have resulted in decreased costs, and increased profits, for the sales of other products made and sold by Syngenta.

175. Syngenta also has suffered, and will continue to suffer, irreparable harm to its business and goodwill as a direct and proximate result of the anticompetitive conduct of UPL. Its conduct has caused, and continues to cause, Syngenta to incur expenses, and to lose revenues and profits, in an amount to be determined at trial.

**COUNT I**
**(Unenforceability of the '727 Patent)**

176. Syngenta restates and incorporates by reference the allegations of paragraphs 1 to 82 as if fully set forth herein.

177. The acts and omissions of UPL, its named inventors, and/or their respective patent attorneys, during prosecution of the '727 patent and during the later PGR proceeding, as described above, were material to obtaining and maintaining the '727 patent.

178. The acts and omissions of UPL, its named inventors, and/or their respective patent attorneys, as described above, were done with knowledge and with the intent to fraudulently obtain and maintain the ’727 patent.

179. The ’727 patent is unenforceable due to the inequitable conduct of UPL, its named inventors, and/or their respective patent attorneys in procuring the patent.

**COUNT II**
**(Unenforceability of the ’625 Patent)**

180. Syngenta restates and incorporates by reference the allegations of paragraphs 1-82 as if fully set forth herein.

181. The acts and omissions of UPL, its named inventors, and/or their respective patent attorneys, during prosecution of the ’625 patent, as described above, were material to obtaining allowance of the ’625 patent.

182. The acts and omissions of UPL, its named inventors, and/or their respective patent attorneys, as described above, were done with knowledge and with the intent to fraudulently obtain allowance of the ’625 patent.

183. The ’625 patent is unenforceable due to the inequitable conduct of UPL, its named inventors, and/or their respective patent attorneys in procuring the allowance of the patent application.

**COUNT III**
**(Invalidity of the ’625 Patent)**

184. Syngenta restates and incorporates by reference the allegations of paragraphs 1 to 82 as if fully set forth herein.

185. The claims of the ’625 patent are anticipated by and/or obvious over the prior art including but not limited to U.S. Patent No. 9,314,022 (Tobler), which discloses each and every limitation of the ’625 patent.

186. Each claim of the ’625 patent is invalid for failure to satisfy the conditions of patentability as set forth in one or more provisions of title 35 United States Code, particularly sections 102, 103, and/or 112.

**COUNT IV**
**(Walker Process Monopolization in Violation of § 2)**

187. Syngenta restates and incorporates by reference the allegations of paragraphs 1 to 175 as if fully set forth herein.

188. UPL has achieved and maintained a monopoly in the production, sale, or use of a fungicidal mixture containing mancozeb, benzovindiflupyr, and at least one other fungicide (“mancozeb+ combinations”) in the United States by fraudulent omissions and misrepresentations of UPL, its named inventors, and/or their respective patent attorneys during prosecution of the ’727 patent, during the later PGR proceeding, and during prosecution of the ’625 patent.

189. But for UPL’s fraud as described above, the ’727 patent and the ’625 patent would not have been allowed.

190. Knowing that the ’727 and ’625 patents are invalid and unenforceable, UPL has asserted the patents against Syngenta in an attempt to preclude Syngenta from the U. S. mancozeb+ combinations market.

191. By reason of UPL’s violation of the antitrust laws, Syngenta has been injured in its business and property in that, inter alia, Syngenta has incurred and will continue to incur large expenditures in the defense of its freedom to operate against UPL’s demand of a license, and

Syngenta has been delayed and impeded in its effort to research and develop its business, commercialize and sell products in competition with mancozeb+ combinations products in the United States, and has suffered and will suffer economic loss.

192. As a direct and proximate result of UPL's fraudulent and unlawful conduct, competition in the relevant market has been severely harmed through reduced competition, innovation, quality, and consumer choice to the detriment of consumers.

193. As a direct and proximate result of UPL's fraudulent and unlawful conduct, Syngenta has been injured in its business or property, including its cost of defending and challenging UPL's actions, and Syngenta's loss of sales, revenues, synergies, and profits, in an amount to be proven at trial, trebled pursuant to 15 U.S.C. § 15(a).

194. As further direct and proximate result of UPL's anticompetitive conduct, Syngenta is entitled to recover its attorneys' fees and costs herein, pursuant to 15 U.S.C. § 15(a).

**COUNT V**
**(Attempted Monopolization in Violation of § 2)**

195. Syngenta restates and incorporates by reference the allegations of paragraphs 1 to 175 as if fully set forth herein.

196. UPL is violating Section 2 of the Sherman Act by attempting to implement the anticompetitive conduct summarized above with the specific intent to monopolize the sales of mancozeb worldwide or, alternatively, in each the United States and Brazil.

197. UPL's acts summarized above constitute exclusionary conduct within the meaning of Section 2 of the Sherman Act, including, but not limited to, UPL's fraudulent omissions and misrepresentations in connection with the filing and prosecution of the '727 patent, the later PGR proceeding, and during prosecution of the '625 patent, using a campaign of litigation to thwart competition, pursuing objectively baseless and sham litigation to harm competitors and

competition, leveraging unpatentable claims to foreclose competitors, exploiting invalid patents to condition and tie relevant products to exclude competition, and acquiring and eliminating competitors.

198. At all relevant times, there is at least a dangerous probability that UPL would succeed in monopolizing the relevant markets because the markets are highly concentrated, protected by significant and durable entry barriers, and UPL has a high market share, has controlled prices, and has excluded competitors.

199. As a result of UPL's unlawful conduct, competition in the relevant markets has been severely harmed through higher prices and reduced competition, innovation, quality, and consumer choice to the detriment of consumers.

200. UPL's conduct affects a substantial volume of interstate commerce and its conduct has substantial anticompetitive effects.

201. As a direct and proximate result of UPL's anticompetitive conduct as alleged herein, Syngenta has been damaged in an amount to be proven at trial, trebled pursuant to 15 U.S.C. § 15(a).

202. As a further direct and proximate result of UPL's anticompetitive conduct, Syngenta is entitled to recover its attorneys' fees and costs herein, pursuant to 15 U.S.C. § 15(a).

**COUNT VI**
**(Monopolization in Violation of § 2)**

203. Syngenta restates and incorporates by reference the allegations of paragraphs 1 to 175 as if fully set forth herein.

204. UPL is violating Section 2 of the Sherman Act by achieving and maintaining a monopoly in the production, sale, or use of a fungicidal mixture containing mancozeb,

benzovindiflupyr, and at least one other fungicide ("mancozeb+ combinations") in the United States.

205. UPL's acts summarized above constitute exclusionary conduct within the meaning of Section 2 of the Sherman Act, including, but not limited to, UPL's fraudulent omissions and misrepresentations in connection with the filing and prosecution of the '727 patent, the later PGR proceeding, and during prosecution of the '625 patent, using a campaign of litigation to thwart competition, pursuing objectively baseless and sham litigation to harm competitors and competition, leveraging unpatentable claims to foreclose competitors, exploiting invalid patents to condition and tie relevant products to exclude competition, and acquiring and eliminating competitors.

206. As a result of UPL's unlawful conduct, competition in the relevant market has been severely harmed through higher prices and reduced competition, innovation, quality, and consumer choice to the detriment of consumers.

207. UPL's conduct affects a substantial volume of interstate commerce and its conduct has substantial anticompetitive effects.

208. As a direct and proximate result of UPL's anticompetitive conduct as alleged herein, Syngenta has been damaged in an amount to be proven at trial, trebled pursuant to 15 U.S.C. § 15(a).

209. As a further direct and proximate result of UPL's anticompetitive conduct, Syngenta is entitled to recover its attorneys' fees and costs herein, pursuant to 15 U.S.C. § 15(a).

**PRAYER FOR RELIEF**

Wherefore, Syngenta accordingly requests that the Court:

(a) Declare that the '727 patent is unenforceable as a result of UPL's inequitable conduct.

(b) Declare that the ‘625 patent is invalid and unenforceable.

(c) Permanently enjoin UPL and its officers, agents, directors, servants, employees, subsidiaries, assigns, and licenses, as well as all those acting under the authority of or in privity with any who receives actual notice of the injunction, from asserting or otherwise seeking to enforce the ’727 patent or the ’625 patent.

(d) Declare that this is an exceptional case under 35 U.S.C. § 285.

(e) Award Syngenta its costs and attorneys’ fees incurred in the PGR of the ’727 patent.

(f) Award Syngenta its costs and attorneys’ fees incurred in the Federal Circuit Appeal of the PTAB Decision of the ’727 PGR proceeding.

(g) Declare that UPL’s conduct constitutes a violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

(h) Award all available damages resulting from UPL’s violations of Section 2 of the Sherman Act, 15 U.S.C. § 2.

(i) Treble the damages awarded to Syngenta pursuant to 15 U.S.C. § 15(a) as a consequence of UPL’s violation of the Sherman Act.

(j) Award Syngenta its reasonable attorneys’ fees under 15 U.S.C. § 15(a).

(k) Award Syngenta pre-judgment and post-judgment interest.

(l) Award damages in an amount to be determined for the injury to Syngenta’s business and property suffered by reason of UPL’s intentional and malicious tortious conduct, together with appropriate punitive damages in an amount to be determined.

(m) Award any other further relief as this Court may deem just and proper.

Dated: September 11, 2025

Respectfully submitted,

BAKER & HOSTETLER LLP

*/s/ Charles C. Carson*

Toni-Junell Herbert, Esq.*
Charles C. Carson, Esq. (VA Bar 48164)
Danyll W. Foix, Esq.*
David M. Klecyngier, Esq.*
Daniel P. Wicklund, Esq.*
BAKER & HOSTETLER LLP
1050 Connecticut Avenue, NW, Suite 1100
Washington, DC 20036
Tel: 202.861.1500
Fax: 202.861.1783
Email: THerbert@bakerlaw.com
CCarson@bakerlaw.com
DFoix@bakerlaw.com
DKlecyngier@bakerlaw.com
DWicklund@bakerlaw.com

Leif R. Sigmond, Jr., Esq.*
Jennifer M. Kurcz, Esq.*
BAKER & HOSTETLER LLP
1 Wacker Drive, Suite 3700
Chicago, IL 60606
Tel: 312.416.6200
Email: LSigmond@bakerlaw.com
JKurcz@bakerlaw.com

*Counsel for Plaintiff Syngenta Crop Protection AG*

* *Pro hac vice applications forthcoming*